[No. A053717. First Dist., Div. One. June 24, 1992.]

BRIDGESTONE/FIRESTONE, INC., Petitioner, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
NATHAN RIOS, a Minor, etc., et al., Real Parties in Interest.

1386

## COUNSEL

Hancock, Rothert & Bunshoft, Paul D. Nelson, Peter J. Koenig, Jones, Day, Reavis & Pogue, Dean B. Allison, Harvey M. Grossman, Crosby, Heafey, Roach & May and Patrick J. Becherer for Petitioner.

LeBoeuf, Lamb, Leiby & MacRae, Stephen T. Waimey and Viken K. Pakradouni as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Horowitz & Pietraczyk, Hagai Horowitz and Daniel U. Smith for Real Parties in Interest.

## OPINION

NEWSOM, Acting P. J.—

### SUMMARY

Petitioner Bridgestone/Firestone, Inc. (Firestone), seeks extraordinary relief to compel respondent Alameda County Superior Court to set aside its order requiring Firestone to provide certain trade secret (Evid. Code, § 1060) information to real parties in the underlying personal injury action. The disclosure is subject to a protective order. (Civ. Code, § 3426.5.)

Firestone insists that on the record below respondent was required to deny the motion in its entirety or alternatively to first require real parties to pursue less intrusive alternatives to disclosure.

As will be seen, we grant the petition, and in doing so, we specify guidelines for trial courts to evaluate trade secret discovery requests in future cases. (*Oceanside Union School Dist.* v. *Superior Court* (1962) 58 Cal.2d 180, 185-186 [23 Cal.Rptr. 375, 373 P.2d 439].)

### BACKGROUND

Petitioner is the defendant in a wrongful death action. Real parties are the survivors of Lydia Consuela Rios, who was killed August 14, 1988, in an automobile accident allegedly caused by the failure of one of the Firestone "721" tires on the car she was driving.[1] Real parties' complaint pleads Firestone's liability under theories of negligent design and manufacture and failure to warn; breach of express or implied warranty; and strict liability for defective design, manufacture and failure to warn. Petitioner answered the complaint with various affirmative defenses.

In the course of the litigation, real parties served petitioner with interrogatories seeking manufacturing specifications for the tire involved in the accident (incident tire) and other tires of the same type and size.[2] The specifications include code numbers which correlate with formulas or "recipes" necessary to fully translate and describe each of the rubber compound

---

[1] The tread of the right rear tire completely separated from its casing.

[2] The incident tire had been used as a spare and failed shortly after placement on the car. It is alleged to have been one of five Firestone "721" tires obtained by the previous owner as an

components identified by the code numbers. Petitioner objected; real parties moved to compel answers to the interrogatories.

Respondent first determined that the formula information sought by the interrogatories constituted a trade secret. (Civ. Code, § 3426.1;[3] Evid. Code, § 1060.) Respondent subsequently ordered Firestone to provide real parties with "the complete specifications, including, but not limited to, the compound formulas and 'recipes,' for any Firestone '721' product line tire known . . . to have been on or in the vehicle which is the subject of this lawsuit from the date of the manufacture of said vehicle to, and including, the date of the accident which gives rise to this litigation."

Disclosure was made subject to a protective order. This petition followed, challenging the order to the extent it required Firestone to produce the trade secret formulas. Petitioner did not claim that the specifications (as opposed to the formulas) are a trade secret. ■ ■ Following our denial, Firestone petitioned for review in the Supreme Court, and the matter was retransferred to us with directions to issue our alternative writ. (Code Civ. Proc., § 1087.)[4] We complied.

## ISSUES

Evidence Code section 1060 provides: "If he or his agent or employee claims the privilege, the owner of a trade secret has a privilege to refuse to disclose the secret, and to prevent another from disclosing it, if the allowance of the privilege will not tend to conceal fraud or otherwise work injustice." Firestone reads the section to permit disclosure of a trade secret only if there is a clear and compelling need for the disclosure, insists that the superior court failed to apply such a standard in the proceeding below, and argues that under such a standard real parties have no need for the formulas.

---

adjustment under Firestone's warranty, replacing Firestone "500" tires. Subsequently, the other four of these "721" tires were also adjusted and were replaced with new "721" tires, leaving the spare.

[3]Civil Code section 3426.1, subdivision (d) provides: " 'Trade secret' means information, including a formula, pattern, compilation, program, device, method, technique, or process, that: [¶] (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

[4]"The Supreme Court's order directing that an alternative writ be issued constitutes a determination that, in the ordinary course of the law, the petitioner is without an adequate remedy." (*Omaha Indemnity Co.* v. *Superior Court* (1989) 209 Cal.App.3d 1266, 1274-1275 [258 Cal.Rptr. 66].) It does not stand for the proposition that the Supreme Court has determined that petitioner was correct on the merits, or justified, but merely that extraordinary relief is the only adequate avenue for review. (And see *Krueger* v. *Superior Court* (1979) 89 Cal.App.3d 934, 936 [152 Cal.Rptr. 870].)

At the very least, says Firestone, respondent should have required real parties to pursue less intrusive alternatives than complete disclosure of the formulas. Further, Firestone contends that a protective order is of no significance. Last, it attacks specific provisions of the order. Because we conclude that real parties failed—as a matter of law—to make a prima facie showing of their need for the formulas (*Greyhound Corp.* v. *Superior Court* (1961) 56 Cal.2d 355, 383 [15 Cal.Rptr. 90, 364 P.2d 266]), we need not address petitioner's other contentions.

DISCUSSION

I. *The Trade Secret Privilege*

The legislative history of Evidence Code section 1060 is sparse. Law Revision Commission comments to the section explain that the privilege "is granted so that secret information essential to the continued operation of a business or industry may be afforded some measure of protection against unnecessary disclosure. . . . Copyright and patent laws provide adequate protection for many of the matters that might otherwise be classified as trade secrets. Recognizing the privilege as to such information would serve only to hinder the courts in determining the truth without providing the owner of the secret any needed protection. . . . [D]isclosure of the matters protected by the privilege may be essential to disclose unfair competition or fraud or to reveal the improper use of dangerous materials by the party asserting the privilege. . . . [¶] Therefore, the privilege exists under this section only if its application will not tend to conceal fraud or otherwise work injustice."

 We agree with petitioner that it would be error for respondent to have ordered disclosure of trade secret information which was only relevant *to the subject matter of the pending action* within the meaning of Code of Civil Procedure section 2017, for such a rule would render Evidence Code section 1060 meaningless.

Evidence Code section 1060 may not be read in isolation. The Civil Discovery Act of 1986 (Code Civ. Proc., § 2016 et seq.) permits any party to obtain "discovery regarding any matter, *not privileged*, that is relevant to the subject matter involved in the pending action or to the determination of any motion made in that action, if the matter either is itself admissible in evidence or appears reasonably calculated to lead to the discovery of admissible evidence. . . ." (Code Civ. Proc., § 2017, subd. (a), italics ours.) But "'. . . [a]n appellate court cannot reverse a trial court's grant of discovery under a "relevancy" attack unless it concludes that the answers sought by a given line of questioning cannot as a reasonable possibility lead

to the discovery of admissible evidence or be helpful in preparation for trial.' " (*Colonial Life & Accident Ins. Co.* v. *Superior Court* (1982) 31 Cal.3d 785, 790 [183 Cal.Rptr. 810, 647 P.2d 86].) Relevancy to the subject matter has been construed to be broader than relevancy to issues (*Laddon* v. *Superior Court* (1959) 167 Cal.App.2d 391 [334 P.2d 638]) and may vary with the size of the case. (See generally Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 1991) ¶¶ 8:66-8:67, pp. 8C-1–8C-1.1.)

■ Allowance of the trade secret privilege may not be deemed to "work injustice" within the meaning of Evidence Code section 1060 simply because it would protect information generally relevant to the subject matter of an action or helpful to preparation of a case.

Our view finds support in federal authorities. Federal Rules of Civil Procedure, rule 26(c)(7) requires the party opposing discovery of a trade secret to bring itself within the rule, but then requires the party requesting discovery to demonstrate the relevance *and the necessity* of the information to the action. Cases have required the requesting party to "make a clear showing that the documents are relevant to the *issues involved in this litigation.*" (*Duplan Corporation* v. *Deering Milliken, Inc.* (D.S.C. 1974) 397 F.Supp. 1146, 1185, italics in the original; see also *American Standard Inc.* v. *Pfizer Inc.* (Fed.Cir. 1987) 828 F.2d 734, 742.)

California authority addressing the privilege is sparse.

Prior to the enactment of Evidence Code section 1060, *Willson* v. *Superior Court* (1924) 66 Cal.App. 275 [225 P. 881], had recognized the necessity of protecting trade secrets from wholesale disclosure during litigation, but then required disclosure of protected information on grounds that "[n]o man is entitled to be protected in his property right to a trade secret where, by the exercise of such right, he has wrought an injury to another and the disclosure of such secret is *indispensable to the ascertainment of the truth and the ultimate determination of the civil rights of the parties.*" (*Id.*, at p. 280, italics added.)

In *Willson*, an employee was injured by an actinic flare which exploded when he attempted to use it. The plaintiff employee's attorney had asked for the "chemicals or substances or drugs" and their proportions which made up the flare. This was the trade secret.

The *Willson* court explained that "[t]he position of the injured employee with reference to the chemical composition of the flare is not one either of

idle curiosity, or yet one of an interest from the standpoint of a business competitor or a rival. The case of the injured employee may of necessity require the showing which he has attempted to make. The result of the trial may depend absolutely upon the ability of the plaintiff to demonstrate the inherently dangerous qualities of the substance of which the flare is composed. His interest in knowing the chemical composition of the flare may be vital to his case in that in order to sustain his cause, he may be obliged to convince the trial court that the substance of the flare, at least in the condition it was at the time it was used, . . . was 'highly and dangerously explosive.' It would, therefore, become *not merely incidental to plaintiff's cause of action*, but would be the very crux of the matter. Far from being collateral, it would then *present the paramount issue* of the case. To say the least, the determination of the explosiveness of the flare is *a material element of the action*, and the offered evidence is unquestionably relevant thereto." (66 Cal.App. at p. 279, italics ours.)

In *Agricultural Labor Relations Bd.* v. *Richard A. Glass Co.* (1985) 175 Cal.App.3d 703 [221 Cal.Rptr. 63] (*ALRB*), the lower court determined that business records requested from Glass/DMB constituted trade secrets and that the equities of the case mandated protection.

The records had been sought in an administrative inquiry into the United Farm Workers' (UFW) unfair labor practice complaints, which included an allegation that Glass/DMB had diverted bargaining unit work without notice to or bargaining with the UFW. The records went to the heart of this complaint, and relevancy was not challenged by Glass/DMB. The appellate court found that the burden was on Glass/DMB to prove, not only that the trade secret privilege existed, but also how disclosure would injure its business. The court concluded that allowing the privilege to stand would tend to work an injustice on the agricultural workers involved.[5]

Thus in both *Willson, supra,* and *ALRB, supra,* the information sought was not just relevant to the general subject matter of the lawsuit and helpful to preparation of the case. Rather, the record in each instance demonstrated prima facie that the information was directly relevant to a material element of a cause of action and further that the moving party would be unfairly disadvantaged in its proof absent the trade secret. ■ Failure to disclose the information would "work an injustice" within the meaning of Evidence Code section 1060 because one side would have evidence—reasonably believed to be essential to a fair resolution of the lawsuit—which was denied the opposing party.

---

[5]A third case (*Agricultural Labor Relations Bd.* v. *Exeter Packers, Inc.* (1986) 184 Cal.App.3d 483, 493, fn. 6 [229 Cal.Rptr. 87]) follows *ALRB, supra,* 175 Cal.App.3d 703, without discussion.

Under such circumstances, we believe that a court is required to order disclosure of a trade secret unless, after balancing the interests of both sides, it concludes that under the particular circumstances of the case, no fraud or injustice would result from denying disclosure. What is more, in the balancing process the court must necessarily consider the protection afforded the holder of the privilege by a protective order as well as any less intrusive alternatives to disclosure proposed by the parties.

■ We therefore hold that the party claiming the privilege has the burden of establishing its existence. (Evid. Code, § 405; *ALRB, supra,* 175 Cal.App.3d at p. 715.) Thereafter, the party seeking discovery must make a prima facie, particularized showing that the information sought is relevant and necessary to the proof of, or defense against, a material element of one or more causes of action presented in the case, and that it is reasonable to conclude that the information sought is essential to a fair resolution of the lawsuit. It is then up to the holder of the privilege to demonstrate any claimed disadvantages of a protective order. Either party may propose or oppose less intrusive alternatives to disclosure of the trade secret, but the burden is upon the trade secret claimant to demonstrate that an alternative to disclosure will not be unduly burdensome to the opposing side and that it will maintain the same fair balance in the litigation that would have been achieved by disclosure.

## II. *Application to This Case*

Applying these principles to the instant proceedings, we first examine the pleadings—as did respondent—to determine the material elements of real parties' causes of action, their theories of recovery and petitioner's defenses. As we have seen, real parties alleged several theories upon which they may recover damages, including negligent design, manufacture and failure to warn, strict liability for defective design, manufacture and failure to warn, and breach of warranty. As relevant to the negligence and strict liability causes of action, petitioner asserted defenses that plaintiffs' decedent was careless and negligent, thereby proximately contributing to the accident, and that plaintiffs' decedent assumed the risks of any hazards and perils of the conditions referred to in the complaint. Further, petitioner pleaded that the injuries were caused by the negligence of third parties, and that any defect in the product was proximately and solely caused by "alterations, improper maintenance or misuse of said product by plaintiffs' decedent or persons other than" petitioner.

■ To prevail on their strict liability and negligence allegations, real parties must prove that a deficiency in the tire caused the accident. And, it is

not enough that they show a "subsequent accident or shattering of the equipment"; they must also demonstrate that the product was in a defective condition when it left the manufacturer. (*McCurter* v. *Norton Co.* (1968) 263 Cal.App.2d 402, 407 [69 Cal.Rptr. 493].)

Under their negligence theory, of course, real parties will also have to prove that the defect was the result of Firestone's negligence. (*Jiminez* v. *Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 383 [93 Cal.Rptr. 769, 482 P.2d 681, 52 A.L.R.3d 92].) But they may meet this burden under the res ipsa loquitur doctrine, without proof of a particular defect "but only a showing that the occurrence of the injury is of such a nature that it can be said in the light of past experience that it was probably the result of negligence of someone and that the defendant is probably the one responsible." (*Id.*, at p. 385.)

■ "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being. . . ." (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, A.L.R.3d 1049].)

"[T]he defect or defectiveness concept has embraced a great variety of injury-producing deficiencies, ranging from products that cause injury because they deviate from the manufacturer's intended result . . . to products which, though 'perfectly' manufactured, are unsafe because of the absence of a safety device . . . and including products that are dangerous because they lack adequate warnings or instructions . . . ." (*Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413, 428 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1].)

"In general, a manufacturing or production defect is readily identifiable because a defective product is one that differs from the manufacturer's intended result or from other ostensibly identical units of the same product line. . . . A design defect, by contrast, cannot be identified simply by comparing the injury-producing product with the manufacturer's plans or with other units of the same product line, since by definition the plans and all such units will reflect the same design. . . ." (*Barker* v. *Lull Engineering Co.*, *supra*, 20 Cal.3d 413, 429.)

■ A design defect may be proved in either of two ways. "First, . . . if the plaintiff establishes that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. Second, . . . if the plaintiff demonstrates that the

product's design proximately caused his injury and the defendant fails to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design." (*Barker* v. *Lull Engineering Co., supra*, 20 Cal.3d 413, 432.) Once the plaintiff proves prima facie that the injury was proximately caused by the product's design, the burden of proof shifts to the defendant to prove the product is not defective. (*Id.*, at p. 431.) And evidence of subsequent design changes or repairs is admissible to show a manufacturer changed its methods in response to knowledge of defects giving rise to the accident. (*Ault* v. *International Harvester Co.* (1974) 13 Cal.3d 113, 117-121 [117 Cal.Rptr. 812, 528 P.2d 1148, 74 A.L.R.3d 986].)

Real parties' strict liability and negligence causes of action also include allegations that petitioner did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific knowledge available at the time of manufacture and distribution. (*Anderson* v. *Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 1002 [281 Cal.Rptr. 528, 810 P.2d 549].) "[A] reasonably prudent manufacturer might reasonably decide that the risk of harm was such as not to require a warning as, for example, if the manufacturer's own testing showed a result contrary to that of others in the scientific community. Such a manufacturer might escape liability under negligence principles. ▉ In contrast, under strict liability principles the manufacturer has no such leeway; the manufacturer is liable if it failed to give warning of dangers that were known to the scientific community at the time it manufactured or distributed the product." (*Id.*, at p. 1003; and see *McKinney* v. *Revlon, Inc.* (1992) 2 Cal.App.4th 602, 607 [3 Cal.Rptr.2d 72].)

It is thus apparent from the pleadings that the specifications for the tires (and their formula recipes) are potentially necessary to real parties' ability to prove their case and rebut Firestone's defenses.[6] But it is not enough that a trade secret might be useful to real parties. As we have seen, they were required to make a prima facie showing that the formulas in fact were relevant and necessary to their proofs.

Turning to the evidence before respondent, we note that while the burden of making a prima facie showing of the particularized need for a trade secret is on the party seeking discovery, the trial court need not ignore evidence presented by the opposing party on the question whether the information sought is a trade secret. Here, in addition to the pleadings and declaration of real parties' expert, the court reviewed the declaration of Firestone's Robert O. Martin which explained that "the physical properties of finished tires

---

[6]Apparently, real parties have conducted no discovery concerning Firestone's defenses.

[rather than the compound formulas] . . . determine the performance of any tire." But Martin also stated that, "As automobiles and other vehicles continually change through technological improvement, so do the braking, cornering, traction, load capacity, dimensional and other performance requirements that the tires on those vehicles must meet. This, of course, necessitates continuing changes in the components of those tires and in the rubber compounds used in those components." Petitioner's expert, Mr. Gardner, conceded that it is not possible to "reverse engineer" a vulcanized tire (i.e., to determine compound formulas from the finished product). Further, he stated that "[r]ubber compound formulas are derived to achieve certain desired physical properties in the finished tire . . . ."

Real parties submitted the declaration of their expert, Herbert Hindin, who stated that while he understood what happened to the tire, i.e., that its tread separated from the casing and that its rubber was prevulcanized, he did not know *why* the failure occurred.

After submitting his qualifications as an expert, Mr. Hindin stated that he had advised his clients to seek the chemical recipe information to "help to establish the reason why this particular tire failed." He said that he had "determined that there was *faulty adhesion* between the belt structure components of the tire. Such failures of the tire components to properly adhere can be caused by improper specifications and/or materials, and the properties of the materials can be affected in the course of the manufacturing process." He thus apparently had no difficulty concluding that the tire was defective when it left the manufacturer's hands.

He went on to explain that the formulas and any changes to them could assist him in determining whether the tire failure was caused by a manufacturing defect or a design defect. He noted that the formulas and subsequent changes to them might indicate that Firestone was using belt materials prone to prevulcanization (a design defect), but if they did not, then the failure may have been caused by processing and storage (a manufacturing defect). He also gave specific examples of the manner in which formulas were helpful in evaluating the reasons why tire components fail. And he explained, from his own experience and that of others in the field, how information like that sought by real parties was important in an analysis and proof of why a tire failed.

But nowhere did Mr. Hindin describe with any precision how or why the formulas were a predicate to his ability to reach conclusions in the case. In particular, while he noted that changes in the specifications would be helpful in his analysis, he failed to explain why the formulas themselves (in addition

to the specification information) were necessary. In fact, he explained that in another case, he was able to draw conclusions about problematic design based on the specifications without formula information.[7]

██ The declarations of the parties' experts plainly establish that the trade secret formulas would be helpful to the analysis of the case and to Mr. Hindin's ability to reach conclusions and render opinions concerning the tire's failure and Firestone's knowledge of problems with it. But nothing in the record demonstrates the necessity of the formula information to real parties' ability to carry their burden of proof. Real parties thus failed to make a prima facie showing of their need for the compound formulas, and respondent erred in ordering their disclosure.[8]

## CONCLUSION

Let a peremptory writ of mandate issue commanding respondent County of Alameda Superior Court to set aside its April 30, 1991, order insofar as that order directs Firestone to provide trade secret formulas to real parties.

Stein, J., and Dossee, J., concurred.

A petition for a rehearing was denied July 23, 1992, and petitioner's application for review by the Supreme Court was denied September 24, 1992.

---

[7]Petitioners insist that the declaration is also deficient because Mr. Hindin failed to specify the scientific criteria against which he would measure the correctness of the formulas. But the question whether a more specific declaration could be additionally challenged for failure to include a *Kelly/Frye* (*People* v. *Kelly* (1976) 17 Cal.3d 24, 30 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (1923) 293 F. 1013, 1014 [54 App.D.C. 46, 34 A.L.R. 145]) analysis is not before us.

[8]The record indicates that respondent was troubled by Firestone's express intention to cross-examine Mr. Hindin at trial about his knowledge of the formulas, an intention disavowed by petitioner in this court. Plainly, real parties may make a motion *in limine* to preclude mention of the formulas at trial, and of course, if such a motion were denied, real parties would be well justified in renewing their request for disclosure as they would be at any earlier stage of the litigation if they are able to make the required showing.